Good morning, and welcome to the Ninth Circuit. I would like to thank the University of Nevada, Las Vegas, for hosting us here today, and also thank the attorneys for traveling here for the argument. Just by way of very brief background, the case that we will hear today involves an appeal by husband and wife, Mr. Singh Cheema and his wife, Mrs. Kaur, who Mr. Singh is challenging the denial of his withholding of removal. Mrs. Kaur has been granted asylum as a matter of legal possibility, but it was then denied as a matter of discretion by the Attorney General. She is appealing that ruling. And then, in addition, there are several procedural matters in this particular immigration case. We'll hear argument, and then at the close of argument, we'll adjourn court and we'll follow immediately with any questions that those in the audience may have. You may proceed. Thank you. Robert Jobe May it please the Court, I'm Robert Jobe, and I'm appearing pro bono today on behalf of the petitioners, Harpal Singh Cheema and his wife, Reg Winder Kaur. I want to thank each of you for being so generous with your time this morning. My clients and I most sincerely appreciate that. I want to tackle the issues one at a time if I can, but before doing that, I want to discuss more generally the statutes that are applicable to this case, just to make sure that we're on the same page, because in reading the government's brief, it wasn't clear to me that we were on the same page. First, on jurisdiction, the last time that we were here, the court's jurisdiction was subject to IHRA's transitional rules. That's no longer the case, because Section 106D of the REAL ID Act requires that transitional cases like this one now be treated as if they had been filed under the current version of Section 242 of the INA, and that means two things. That means, first, that unless Mr. Cheema's case is moved, as the government claims, the court retains jurisdiction to Second, although the government doesn't rely on it, it means that the court may have to grapple with 8 U.S.C. 1242A2B, which generally eliminates circuit court review over any action or decision of the Attorney General that is specified to be in the discretion of the Attorney General. Now, although the current judicial review provisions apply to this case, the current withholding of deportation statute does not, and the current withholding statute only applies to cases that were commenced on or after April 1, 1997, and that you'll see in Section 309C1 and 2 of IHRA-IHRA. And this is really, really important for a couple different reasons. First, and I would need to pull out the government's brief here, but in arguing that Mr. Cheema has no constitutionally protected liberty interest in applying for non-discretionary non-réforma, the government repeatedly suggests in its brief that former 1243H, that's the statute that applies to this case, says that it should not be construed as creating, quote, any substantive or procedural right or benefit that is legally enforceable against the United States. And you'll see this repeatedly in the government's brief, and if I could get you to turn to page 43 and 44 of the government's brief, down there at the bottom. What page? 43, Your Honor, at the bottom of the page. An example here, at the very last sentence of the government's brief there at the bottom, it says, Section 243H, limited creation of, quote, any substantive or procedural right or benefit that is legally enforceable against any party against the United States or its agents. And it cites 1253H1. If you look at 1253H, you're not going to find that language. It's not in there. You go a little further down the page and the government makes the same representation. There are probably ten pages of the brief that are dedicated to the government's arguing that 1253H contains this language and thereby limits any possibility of a liberty interest. It's not in this statute. The language that the government is quoting, it's in the new version of the Withholding Removal Statute, a much narrower statute. Would you agree that the new version of the statute then eliminates any substantive right? No. No, we don't. So it doesn't matter whether we look at the old version? Well, I think it's relevant, but... Well, it would certainly affect our analysis as to which statute we look at. Right. Exactly. What in your view is the basis that the Withholding Statute is the statute in effect previously? Well, the board agreed with that, and this court agreed with that when it was here the last time. But if you look at IRS Section 309C... Well, that's probably not a totally persuasive reason in the sense of what was the issue that we were really looking at. And last time, I think it's fair to say that we were focusing on the application of the national security exception. Exactly. Apart from whether the board or our court didn't comment on it, why from a legal matter, in your view, is that the applicable statute? Well, first, I think the government, when they get up here, they're going to agree that the old statute applies. But the reason for that is that Section 309C of IRA-IRA makes clear that the amendments to the Withholding Statute that IRA-IRA made, they only apply to exclusion or removal cases that are commenced after April 1st, 1997. This case began back in 1993. And so under Section 309C, the new Withholding of Removal Statute has no application to this case. Now, going back to Judge Rollinson's question, and I want to get more into that in a minute, but I guess the short answer to that is even if this new statute applied, I'm not sure what to do with that language. But certainly, it's our view that irrespective of the language in the statute, an individual like Mr. Chima has a core liberty interest in being free from physical confinement or persecution. I mean, it's all agreed here that when he was returned to India in February of 2006, he was jailed on charges that the immigration judge and the board agreed were fabricated charges. And he spent the next year and a half in custody on fabricated charges. And it's certainly our view that even if you disagree with our analysis about the Withholding Statute creating an entitlement because of its nondiscretionary mandatory language, an individual like Mr. Chima has a liberty interest, a core liberty interest in being free from arbitrary detention at the hands of the Indian authorities. Well, I'd like to ask you a question. Yes, Your Honor. It seems to me the problem is we sustain the ruling of the board that he engaged in terrorist activities. And that makes him permanently ineligible to return to the United States, doesn't it? Well, to be admitted to the United States, right. But somebody who's granted withholding of removal is not admitted. That's a very important distinction. But the point is that because that ruling has not been appealed and his actual removal, the basis for his removal has not been appealed. Is that correct? The basis for his removal is that he arrived in the United States without documents. And no, that's uncontested. He arrived here without proper documents. And it's not being appealed that he's been classified as a terrorist for having engaged in terrorist activities. You've ruled on that and that is binding. Okay. So the only thing that you have on appeal is the denial of the withholding of deportation. But he voluntarily left the United States, correct? I wouldn't go that far. Maybe you don't want to use the word voluntarily because in his view, he was between a rock and a hard place. He felt that if he stayed here, that there never would be any kind of diplomatic decision regarding the situation with India would be window dressing and so it wouldn't make a difference. Let's put it in this way. He's no longer in the United States, correct? Correct. And he's in India. Right. And he knew upon withdrawing his CAT deferral that he would go to India, correct? Right. So how then is there anything for us to decide as a matter of just disability with respect to the withholding of removal because he's gone. There's nothing to withhold at this point. Well, I think we need to look at the mootness doctrine and look at it closely because we all agree that the fact that he's departed the United States, that in and of itself doesn't divest the court of jurisdiction. So ultimately the question is, does his return render the withholding of removal or the withholding of deportation claim moot? We have to agree that the CAT claim is not on appeal here. He terminated that. Correct. Because ultimately he decided the government was going to get diplomatic assurances. They were going to send him back. He'd already spent eight and a half years in custody. And just on that one point, the eight and a half years, because it's hard for me to swallow that language that he voluntarily returned. He spent eight and a half years in custody litigating this case. In the Nadarajah case that this court decided six months after he returned to the United States, this court ruled that the section of law under which he was being detained permits an alien to be detained for six months. After six months, the government has the obligation to demonstrate that that individual is going to be removed from the United States within the reasonably foreseeable future. And if it can't, it has to release him. This man was held 16 times longer than the statute permits. So you would say he was unlawfully detained? He was unlawfully detained, yes. But that argument has not been made, that his removal to India was a result of this unlawful court. I mean, it's not tied up in the appeal. We haven't challenged the CAT denial. I think ultimately the issue is, is the withholding claim moot? Right. And that's really what I want to get to the bottom of, because it's kind of a tricky legal issue. And I understand that your view is that, well, he could come back to the United States. True. But he can't be admitted to the United States, correct? So he could come back illegally to the United States. No. How would he come back? He would be returned to the United States. I mean, even if, let's go back in time and say he'd never left, but he had been granted. No, no. Let's start with he left, because he did. So I only, we know what happens if people never leave, et cetera. Right. But he left. So take us through the scenario from a both factual and legal standpoint of what happens if he decides to come back to the U.S.? Well, if he decides to come back to the U.S., and this is why we think the case is not vote, if he decides to come back to the United States, he could present himself at the border and claim withholding of removal. But if he claims withholding of removal upon return to the United States, he doesn't have to attempt to effectuate any sort of illegal entry. He just presents himself. And he has the right at that point to apply for withholding of removal. No, no, no. Okay. So then he would apply for withholding of removal, but not this removal, because he's already been removed. So see, to me, that's an important distinction. He might apply for new relief. Right. But this particular relief is distinguished. Because that assumes, I think, that you think this first application is moot. And we don't. Well, I'm not saying it's moot. I'm saying that wouldn't it be moot? Because if he came back, it wouldn't be this withholding of removal that he would be invoking. No. No. Because ultimately, I agree that if he came back and he had to file a new application, he's going to be deemed ineligible. Because the new law is going to apply, and under the new law, there is no exception for people who can demonstrate that they're not a danger to national security. If you provide a terrorist, material support to a terrorist organization, you are ineligible. And we consider that to be one of the most important collateral consequences of his removal. So you say if the new law applies, he wouldn't be able to get it. Correct. I want to ask you another question. He claimed quite reasonably that he might be subjected to persecution if he returned to India. He goes back to India. He's sentenced to five years imprisonment. Does he have any more basis for fearing something in India? If after five years he turned up at the border, what claim does he have of fear in India? Unfortunately, none of that stuff is in the record. But what I can say, and the government doesn't dispute this, again, the five-year sentence that he received, you have to accept as true the factual findings of the immigration judge and the board, and they both concluded that the charge on which he was convicted was a fabricated charge. It was what? It was a fabricated charge. It was a trumped-up card. It was pretextual. But it was an attempt to persecute him for his political activities. It was pretextual. And that particular fact is undisputed. He appeals to the Supreme Court. The Supreme Court grants his appeal, orders him released. So he was released from Indian prison after a year and a half because the government never had any jurisdiction to try him. So now he's back in India. And for that reason, we think the case is not moot. He's back in India. And if you Google, you'll see a news article that just a few weeks ago says he was re-arrested for organizing a demonstration. I talked to him this weekend. That's in fact not true. They came to arrest him. He fled. But he's still under threat of persecution. And that's the point of our mootness argument, is that the case cannot be moot because he's still threatened with very serious injury as a result of the board's... Could I just follow that through, though? Yes, Your Honor. I'm assuming that that would be true or that he might have future claims depending on what happens even after he gets released again and he's out in the society. But in the Abdallah case, we said it was moot because even though there were some collateral consequences, that particular individual would be permanently denied entry back into the United States. Why isn't that... What was the relief Abdallah was seeking? Pardon? What was the relief Abdallah was seeking? It was a withholding of removal case. Okay. I'll have to look at that when I go back to my table. I'll take a look. I guess maybe I could just phrase it a little differently apart from Abdallah. If the individual is permanently barred from re-entry into the United States, how then is the case not moot? See, that's why I want to go back and explain, even if he hadn't left, he would not have been admitted. He would not have legally entered the United States. Withholding doesn't give you that right. No, I understand. He's never been, quote, admitted. Right. So all we're asking is that he, in terms of the relief we're seeking, we're asking that he'd be restored to the position he had been in before his removal, which would be that of an alien seeking admission, but he's never going to be admitted. Knowing that he's not going to be admitted, he's applying for withholding of removal, which means simply he can't be removed to a country where he faces persecution. So he would be returned to the United States, not admitted, but he'd be restored to the position he otherwise would have been in. Okay, let me just get it straight as a practical matter. He would come over here, and then he would be put back in jail because he can't be admitted, therefore he's at the border as a non-admitted individual. So he would then be put in jail, and if he's successful in this appeal, then his removal would be withheld. But if he's not successful, then he would just sit in jail in the United States? No. He wouldn't come? No, because now the law is crystal clear. He filed a habeas, his habeas was granted, the district court stayed, because the government kept coming in and saying national security, national security, the district court stayed its order granting the habeas. But now if he came back, the law is crystal clear. Under Nadarajah, he can't be detained. Legally, the statute under which he was detained only allowed the government to detain him for six months. But he could not be detained anew? For six months. Right, but then after that, so what you're saying is he could come back here, and then after six months, he could no longer be detained, so then he would just be awaiting proceedings? He would be essentially, probably at that point, paroled into the United States, because that's the normal process for somebody in that situation who can't be admitted, but is granted withholding. They're released from custody after six months, because now we all agree the statute doesn't allow the government to hold people for such extended periods of time. So he'd be living here, but not have been admitted with a grant of withholding. And what that means is, as a practical matter, he's entitled to be here until it's safe for him to go back, until the government can prove that it's safe for him to go back. And he has the right to work here, and he has the right to be with his family. But then wouldn't he be back in the kind of catch-22 situation you said he was in already, as to why he gave up the deferral of the Catt claim? No. Because of the India giving assurance of the United States saying, well, to argue it's, why wouldn't it be the same? Because it's not the same. I mean, Catt is really a weak remedy. For Catt, to defeat a Catt claim, and this is why he thought this was a farce, and that's the way the middle district of Pennsylvania just described the regulations. The court described it as a farce. With somebody who's granted deferral of removal, all the government has to do is get a diplomatic assurance that he's not going to be tortured, and then they can remove him. They don't have to go back before an immigration judge. They don't have to come before this court and explain how that diplomatic assurance eliminates the threat of torture. Withholding of removal doesn't work that way. And that's why when Mr. Chima, when he was immigration judge and he agreed to terminate his Catt claim, he said then to the immigration judge, I'm terminating this, but I want to fight that withholding claim. Because withholding is a much more durable remedy. The government doesn't just get to go get diplomatic assurances and then come in and terminate, unilaterally terminate a Catt withholding grant. It would have to go before an immigration judge and prove that these diplomatic assurances have reliability, and it means he's not going to be persecuted. Catt doesn't require that, and that's why the Middle District of Pennsylvania just declared those regulations unconstitutional. I don't want to move your argument, but you make an important point, of course, withholding is better than the Catt deferral, but withholding is not as good as asylum. Right. So I'd like to ask you some questions about Mrs. Cower's claim. Yes. Because she does have withholding, but it's not the same as you, of course, appropriately point out for asylum, because she can't go back, she can't travel. Right. For example, to India to visit. Right. So the legal issue we have is, you know, exercise of discretion by the Attorney General, which is pretty hard to overturn. So I would appreciate your comments on what grounds you think there was actually something more akin to a legal mistake with respect to that evaluation. Yes. The strongest point, and I don't think it's a point that the government even addresses in its brief, is that the decision from the Board in this case is completely inconsistent with this Court's decision in Kaloubi. In Kaloubi, Judge Reimer, Judge O'Scanlan, and I forget the third member of the panel, they had a case just like this. And in that case, the individuals deemed credible, but denied asylum in the exercise of discretion, because although deemed credible, the immigration judge said that the person had been less than candid in discussing his or her connection to some terrorist organization. And that's almost the precise language used here. It's exact. I mean, it's almost the exact same language. And what Judge Reimer's opinion says is that a person can't be credible for purposes of determining statutory eligibility for asylum, and not credible on the same point when it comes to the exercise of discretion. But that's exactly what the Board did here. And we cited Kaloubi in our opening brief, and the government just ignored it. But in addition to that, the Board ignored the fact that she has a 14-year-old U.S. citizen's son, the fact that she's been here for 14 years, she's never committed any crimes. I mean, it didn't weigh all the factors, all the relevant factors, as it was required to do. What about the alien smuggling issue? Well, the alien smuggling is certainly something that the Board can legitimately consider, but obviously it has to balance that against all these other factors. And with regard to the alien smuggling, obviously I think they should have also taken into account the circumstances that it was her daughter, that she'd been separated from her daughter for an extended period of time because these proceedings have dragged on so immeasurably long. But, you know, it's certainly something that the Board was free to consider. But it has to weigh these other things in the mix. How would it work, then, let's assume that we think that Kalubi is applicable here for its principles, so at least one of the grounds on which they were juggling their discretion was improper. What's the remedy for that? Well, the remedy is to basically say the Board abused its discretion and kick it back. You don't get to dictate that the Board must grant, you know. If the Board made legal error in balancing, it has to have another opportunity to balance. And then if they go back to the Board, then we're back to this other issue. Is the alien smuggling saying that she would like to do anything she could to bring her child over, or is it something else? And if it's something else, I guess your argument is she doesn't know what that is. Right, exactly. And that's a more difficult question about whether the use of classified evidence is permissible in the asylum context, the discretionary context, rather than withholding. And that's something that, you know, you would have to address. I think, I do want to just walk through the Board's decision real briefly, you know, if I can. And it's attached to our brief, and I want to look at the section dealing with their analysis that Chima is a danger to national security. Because I think essentially what the Board did here is it just, it did the exact same thing it did the first time around. And that is, it doesn't cite to any evidence at all demonstrating that Mr. Chima's activities, or supposed activities against the government of India, threatened American security. What page are you referencing? I'm sorry, Your Honor. It's page 5 of the decision, which is 42 of the record. Okay. And, you know, when this case was sent back, the Court said substantial evidence is required to link the finding of terrorist activity affecting India with one of the criteria relating to our national security. Judge Noonan said it cannot be that Congress wanted to create a bar to relief based on guesswork. Essentially, it was sent back so that the Board could give reasons, backed by evidence, that the activities in which he was engaged against India somehow threatened American security. Rather than simply assuming it or saying it's self-evident. So the first time around, the Board said, and this is what the Court found to be insufficient, it is clear that those who engage in terrorism within the United States, even when that terrorism is not directly aimed at the U.S., necessarily endanger the lives, property, and welfare of the United States. That was in its first decision. So we go back, and now here's how they've amended their decision. This is that first paragraph there on page 42. First, we agree with DHS that the male applicants' terrorist activities were designed to harm, weaken, or destabilize India. Blah, blah, blah, blah. And thus... Do you agree with that? No, I don't agree with some of it, but I certainly agree that it was... That particular phrase, that first phrase. I certainly don't dispute that they were designed to weaken India. I mean, he's trying to create a separate state carved out of India. And so, I think we can all agree that his actions may have some impact on India. But then it goes from there and says, and thus, he endangered the lives, property, welfare of the United States. I mean, it's exactly what they did the first time around. They're not pointing to any evidence at all to support their conclusion that whatever he was doing against India has this impact on the United States. Instead of saying it's self-evident, as they did the first time around, they just said, and thus, it necessarily endangers American security. You go down to the next paragraph. There's a little more said there. It talked about the international cooperation in trying to apprehend terrorists. And those two countries were working together in that effort. Why wouldn't that be a legitimate safety concern of the United States, to have cooperation with a neighbor in the Middle East that's trying to help them combat global terrorism? Well, if there were actually evidence showing that Mr. Chima was somehow impacting that collaborative relationship, I would have to agree with you. But they don't cite to any evidence. Again, essentially what they're saying is it's self-evident that he's having this impact when they don't cite to any evidence at all. And you go down to the next paragraph. They do the same thing. At the end of that next paragraph that carries on to the next page, they say, without citing any evidence at all, our national security is endangered if we were to take action which could, could is problematic because obviously could is not the test, which could encourage other countries in harboring terrorists if Chima is given sanctuary. They don't cite any evidence. They're saying, again, it's exactly what they did the first time around. They're assuming that if we comply with the Refugee Convention and we protect this person from persecution, it's going to have some adverse effect. But where's the evidence? They don't cite any evidence. It's exactly what they did the first time. And then finally they move on to the classified evidence. And the only classified evidence document that they rely on is this declaration from this special advisory agent. And the government, you know, this is frustrating because the government says, well, we've been given a summary of that. Of course you could, you know, have an opportunity to rebut. I've given you the summary. It's this extract here that I just presented to the court. It begins on page 6,334 of the record. That's the summary. Where does that summarize the evidence that's set forth in the declaration? It doesn't tell us anything. The only summaries that we have are summaries that relate to the government's uncovering of Mr. Chima's activities against India. They've given us a summary that says he was engaged this, that, and the other thing against India. But there's nothing in any of these summaries that suggests that the classified evidence also went to how those activities against India might impact American security. We have nothing. So the government's relying on secret evidence without even telling us that the secret evidence implicates that second question. Nothing at all. Did you want to save time for rebuttal? Yes, Your Honor. We have just over three minutes. Yes, Your Honor. Yes, I attached the decision from the Supreme Court of India to our reply brief, and it's online. We just Googled it. We found it online. The Indian Supreme Court has a webpage, and we just pulled it down. Yes. Yes. Thank you. Thank you, Your Honor. May it please the Court, Chris Fuller for the respondent, Attorney General. First, let me apologize for my voice. I've got a head cold. I'm trying to make sure that I don't spread diseases or germs around here, but I appreciate the Court's indulgence. I'll try not to sneeze or make other inappropriate noises during the course of the argument. Thank you. There are three approaches, I mean, three issues that have been discussed so far in oral argument. One is the mootness. The other is Ms. Cower's discretionary denial of asylum. And the last is whether or not the BIA actually complied with this Court's remand order. And I'd be happy to address them in that same order if it pleases the Court. That's fine. Would you start, however, with the government's position on which withholding of removal statute applies? That's a good – I plan to do that, Your Honor. Thank you. It is true that the current version of the withholding removal and the current version of the INA applies for the procedural process, as Mr. Jobe stated. And it's true that the IDPA version, that's the EDPA version that was passed in April of 1996 prior to the – I rewrote the Illegal Immigration Reform and Immigrant Responsibility Act, came about in October, applied to his charges of removability. The question remains as to which version applies to the question of constitutional rights or substantive rights attaching. And for that reason, we cited to 241 because the Board did not rely on anything classified, and hence raised this due process question until on remand, which was in 2007. And hence, we believe that ultimately when we're discussing the right associated with this withholding of removal, that the Congress' articulation six months after IDPA got passed in ARERA, that no substantive right or procedural right attached would be pertinent to the description of the right involved. And that's why we cited the 241. It's pertinent, but is that the applicable statute to the withholding of removal? It's not the one that applies to his charges, nor does it apply to ultimately whether or not he's barred, but we thought it was appropriate to reference with regard to the creation of a constitutional right because we believe that ultimately a constitutional right is not defined, limited, or changed with regard – when amendments come and go, that it ought to be something that persists. And that's why ultimately we argue that the mandatory slash quote-unquote mandatory language ultimately doesn't work for withholding, as it might work, for example, in amnesty with our American Arab case number one. I might add that it's a little bit difficult to divine that position from your brief. I apologize for that, Your Honor. I think that's a fair assessment. I have to say the way it was written, at least from my perspective, left the reader with the view that this was the applicable statute as opposed to one that might be. I certainly meant not to try to convince the Court to the contrary, but the 243 pre-ARERA statute applies for his charges. Right. We were trying to articulate this claim on his part that he has a substantive entitlement that creates a liberty interest in withholding of deportation, and we thought the articulation by Congress in the 1996 ARERA Act was pertinent to that assessment.  I'm trespassing on your order, but since you bring it up, it would seem to me the law is pretty clear that people have a right to due process in these deportation proceedings. And then the question is, what is due process? And my understanding of due process is that for people, for judges to make a decision, they need to know all the evidence. And for defendants to defend themselves, they need to know all the evidence against them. So as it comes along, it looks like a violation of due process, both in the case of Chima and his wife. They were denied access to information that was being used against them. And what is your answer to that? That there is a general due process right that attaches to immigration proceedings, but it's also clear that there are limitations on that due process right with respect to certain claims for relief. For example, this Court has long stated that there is no liberty interest that attaches to discretionary relief, and hence there is a restriction of due process with regard to that aspect. So the due process right does not permeate the entire proceeding. Now, the question becomes, excuse me, Judge? Doesn't it permeate the entire proceeding in terms of a fair hearing? That's exactly right. The fair hearing has to be fair throughout in a general way, but ultimately, for example, this Court's found that, for example, suspension of deportation, cancellation, adjustment of status are discretionary rights and no liberty interest attaches, and hence no due process rights attach to claims that they were wrongfully denied discretionary relief or opportunity to apply. So is it fair to say that if there were accusations that were made, and those accusations were not known and they were based on secret documents, why wouldn't that be the deprivation of a fair hearing? Well, ultimately, there has to be an analysis of the circumstances. Now, whether or not there's a liberty interest attaches is one aspect. If, in fact, a liberty interest attaches – We're not talking about the liberty interest part of due process. We're talking about the fair hearing part. So looking at it from that rubric, why wouldn't that be a violation of due process to have a proceeding where the accusations are not fully known to the accused? In a very limited sense, it ends up doing a Matthew Eldredge balancing test to compare the governmental interest versus the rights of the individual and whether there's an inherent risk of deprivation of that right. And ultimately, in this case, in a very finite, very narrow application and a very specific bar to withholding of removal, reasonable grounds to believe is a danger to national security. If, in fact, the due process right would bar the attorney general from considering national security information to make a determination of whether national security has been endangered, would, in fact, then bar the attorney general from ever considering the danger to national security unless the national security information is either unclassified or declassified. And it puts, then, the attorney general between a rock and a hard place. Ultimately, in the circumstance here where we have a national security determination, a specific one, not a generic one which was applicable in the IRCA setting of American Arab I, where they decided this was just generally, you can't do this, but this is a very finite, very specifically tailored congressional mandate where an alien is, there are reasonable grounds to believe, a very low threshold probable cause that is a danger to national security. Ultimately, there's a clash of interests, national security, danger to national security. Attorney general has to make that determination based on information provided to him by national security experts in his department. And to limit his determination that there's a danger to national security without being able to consider information that simply cannot be revealed or in itself. We have a number of cases where we've dealt with national security and classified data. Yes. But in those cases, we have quite an extensive affidavit from someone at the NSC or some other security-related agency that explains what the general national security interest is and why it can't be revealed. And those are the public records. That would be probably the assertion of a state secret privilege. Yes, just state secret privilege. Yes, ma'am. But you have a fairly extensive documentation of that. And then, of course, you have the classified data. And we can compare by looking at the classified data, whether it's a fair statement of the invocation of a privilege or whatever. But we don't really have that here in the sense that from the standpoint of the lawyer trying to represent his client, he's kind of shooting in the dark on this issue of whether there's a threat, more specifically whether there's a threat to U.S. security. I mean, how do you defend against that? Well, it's a difficult thing to defend against, Your Honor, and I fully appreciate that in the sense that it does create this collision of interests. But remember, this is not a criminal case where there's a constitutional right to confront. This is a statutory grant. And Congress, in fact, granted in INA Section 240B4B, express grant that classified or confidential information could be used to oppose an application for admission and to rebut an application for discretionary relief. So Congress has made this difficult balancing choice, and it is a difficult one. Mr. Vaughan, why is that information not disclosed to this Court? Well, we didn't, in fact, submit the – I know, but why wasn't the actual information submitted to this Court? No, I think – Not summary, the actual information. No, in the first go-around, on the first appeal, the entire – Yes, but why wasn't it this time? We thought that because the Court had it, there was no need to redo it the second time. Now I can – It's already there. I thought, yes, it's there. There was nothing added. I'm sorry. I didn't know that was the – No, the affidavit referred to by Mr. Job from the special agent of the FBI is in the Court's possession. Yeah. Okay? So the Court has that. And you didn't get all the original data, did you? Yes, we did. But then, I mean, I was puzzled when we got the decision of the board. It was all these pages blacked out. Who did that? Well, that was – They submitted their decision to the FBI for classification review, and that's what – My question to you is, to be honest, I have not – I do not have in my possession the classified decision of the board. Does the Court have that? Isn't it pretty awkward to ask the Court of Appeals to review a decision where half of it is blacked out? Well, I thought that – It was my understanding that we had, in fact, provided the Court with the classified board decision. If we have not, I sincerely apologize. I don't think we have. I mean, you know, we don't, like, quote, keep these things because of the classified data. Yes, I understand. For storage – We don't have – They have to be in a classified storage facility, which we do not have at the Court, which we only have via the U.S. Attorney or the FBI or something. So we don't, quote, have any of this stuff. Well, in the first – my apologies, Your Honor. In the first petition, we were requested to provide that, I think, from Judge – Right. In the first petition. Yes. And that's my misunderstanding. And ultimately, if, in fact, you'd like us to resubmit that, we will certainly do so very quickly. Okay. Let me tell you, on the first petition, my law clerk, who worked with us, had to go through a securities check, had the FBI prowling around her house and so forth. It took several months to do. Now, for some reason, the judges were trusted. We could look at the secret information. But our law clerks could not without a security clearance. That's right. It's a pretty suspicious government that thinks the law clerks can't be trusted, but the judges can. Now, I wonder if you're going to give us more secret stuff, whether you could just clear it up so that at least the law clerks working on it don't have to have security clearance. The one thing that the Court does not have – we would certainly resubmit the rest of the previous material, if you'd like, to make it convenient. But the one thing, apparently, that you do not have, which I thought you had, and I apologize for that, is the unredacted board decision. You're saying you don't have that either? I don't even have that decision, to be honest with you. When you say you don't have it, does that mean you have it? I don't have it in our possession, in our safe. So you had access to it. Actually, I don't recall ever reading it, to be honest with you. So there's been some fallop with the board. It was my impression that, in fact, it was provided. So if it's not, I'll certainly provide a copy. We will follow up with the appropriate Department of Justice security. Well, the board people can do that, and I will make the request, Your Honor. I understand that that, indeed, is a time-consuming process to prevent law clerks from reading that information. But I don't have – I'm not a classifying authorization. We're not law clerks. I understand. I understand. But ultimately, in terms of the general due process request, I think that's my answer, is that it's a balancing question and it's a difficult call. And ultimately, because it's in the immigration context and a very narrow one, I do believe that ultimately the – In the immigration context, what case authority best supports your argument that it's a waning in terms of a due process concern when the use of classified information prevents the applicant from pursuing his or her case? Well, the best case for the balancing is Matthews v. Eldridge. No, I said in the immigration context. But in the immigration context, ultimately, Jay v. Boyd, in which the court used the classified confidential information – Jay v. – Jay v. Boyd. Boyd, B-O-Y-D. Yes, I've cited that in our brief. I'll give you a citation. So you're saying that case supports the – The use of – I'm sorry. I didn't mean to interrupt. Go ahead. That case supports the premise that you have to balance the government's interest against the applicant's interest before deciding whether or not there's been a violation of due process. I don't want to give – I don't want to misrepresent Jay v. Boyd. They didn't do much analysis. What they did was allow the use of confidential classified information in the determination of whether or not an alien applicant for suspension of due process I know that. What I'm saying is you combine Jay v. Boyd with the allowance because they didn't address the actual balancing. They just allowed it to happen, apparently thought on face value it was good enough. But in Jay v. Boyd, which was a Supreme Court case, as I recall, that's a discretionary suspension of deportation. In your view, does it make a difference that we don't really have a discretionary issue with respect to the withholding? Well, that's why we spent the time we did trying to explain that withholding of removal, you have to talk about the underlying right, whether it is, in fact, an entitlement. And ultimately, if in fact – what Jay v. Boyd shows is that there can be – there can be immigration proceedings with regard to that general fair hearing process. Indeed, it can, in fact, use classified evidence for that hearing process and make it fair. I think that's what it stands for. With regard to the specifics for whether it's a non-discretionary one, that's why we spent time in our brief explaining that the withholding of removal claim is not mandatory in the sense that the IRCA claim for amnesty was, for example, and in light of the Supreme – But it's also not really discretionary. You're absolutely right. It's not. Would you – I want to go back to Mr. Jobes' statement with respect to mootness, which ties into this sort of discretionary, mandatory thing. He said that if Mr. Chima were to come back to the United States, he would be able to, in effect, pick up his withholding of deportation status and then go from there, and that's why the case is not moot. Would you explain if you think that would be the procedural posture? Well, it wouldn't be the procedural. The only way that could happen would be if this court entered an extraordinary order that he not be inspected when he comes back, because INA Section 235 requires every alien to be inspected when they come to the United States. They are deemed to be an applicant for admission, and hence every alien must be inspected. Whether they have a green card and have traveled and come back, they are inspected at the border. That's mandatory. So what's the portent of being inspected in terms of the procedural? That means that the law at that time applies to that alien, and hence Mr. Jobes is absolutely right. If he comes back to the border, as Judge Noonan, you acknowledged, he would, in fact, be inadmissible because he's engaged in terrorist activity, and hence he would also be barred under the new law from getting withholding of removal. There's a new inspection. He would have to have a new application for admission. So the only way he would then come under the old umbrella and that rubric is if somehow he could kind of come in under the radar, so to speak, under the old procedure because of this lawsuit. Yes, but if he, for example, snuck in without inspection and we found him, then again he would be present and then we would apply the new law and he would have to be inspected at that time. I don't think he was talking about him sneaking in. I think he was talking about him appearing at the border and presenting himself for whatever would be feasible. Now, there is a provision in the law that allows for what they call advanced parole, and aliens who, for example, have applications pending but are nonetheless on unlawful status can request and obtain what they call advanced parole, which simply means they get a document that says you can come back in and you will be returned in the status you were at the time you left. Can you get that if you're a terrorist, if you've been determined to be a terrorist? Probably not, because it's discretionary. But it is a provision that allows a person, I'm not just saying him, but that's the one provision that allows an alien to go who's in an unlawful status, has not been admitted, and then they leave and come back. Otherwise, every other alien who leaves and comes back gets inspected and the law applies at the time of inspection. Hence, the only way that he becomes, that he could somehow go non-pro-tunk, if you will, back to the time he was before he left and before he was removed after he took his CAT grant away, would be as if this Court entered an extraordinary writ of mandamus, basically, to force the Department of Homeland Security not to inspect him. And I think that's an extraordinary relief, certainly not asked for here. You're reviewing a petition for review. Yes, ma'am, excuse me. Would the availability of the advanced parole render this case not moot? If, in fact, he had obtained it? No, if the possibility of him requesting it. Does that make this case not moot? No. It's too late to get it now he's gone. Advanced parole only comes before it's advanced. You have to get it while you're here before you leave. Before you leave. Okay. So now once he's left and he's in India, you're saying there's no way he could represent himself without inspection? Yes. And that's why the question becomes here. Now, the ramifications, we're not asking that this Court consider that every alien who's removed, because oftentimes this Court denies stays of removal. And Mr. Job is right. We oppose those stay applications to say that. Indeed, even if they are removed, in almost all circumstances, they can, in fact, prosecute their petition for review in this Court from outside the country. Here we have two very unique confluences of events that creates this circumstance. One is his knowing and voluntary termination of his CAT grant. And the second occurred immediately thereafter, and that is his affirmative choice not to obtain or not to request, not to request a stay of removal from this Court pending review of this petition for review. Mr. Job is well aware, practicing in this circuit for a long, long time, that all an alien has to do is ask this Court for a stay along with the petition, and a de Leon temporary stay is put in place, and an alien will not be removed. So those two events combined together create a very unique circumstance for this alien, that his removal now to India, based on those circumstances, and the fact that the same proof applied to his CAT grant as applied to his withholding claim, which is very interesting. He didn't provide the board or the immigration court with different evidence of persecution or torture for the asylum or withholding. It was all the same evidence, all the same claim, all the same allegations of persecution and torture. And hence, he gave up on the one. Mr. Job says that the CAT is a weak remedy. To the contrary, no bars apply to torture protection. If torture protection is granted, whether deferral or withholding, not a single bar applies. It doesn't matter whether the alien committed a serious political offense outside the United States, whether he persecuted others, whether he's a danger to national security. It doesn't matter. There are no statutory bars to torture protection grant. It is, in fact, the stronger of the two, if you will. Now, he did mention assurances. I can tell you that I've been doing national security immigration law now since 1996, and I can tell you there are, in immigration proceedings in that time period, there are four cases in which assurances were at issue. I handled two personally. I was involved in the third, and a fourth I was not. We consulted briefly on it, and there's still litigation going on in two of them. One was to Egypt. One was to Saudi Arabia. It's extremely difficult to obtain assurances, first of all, to get the State Department to even ask for them, because it basically insults the country, saying even though you're a signatory to the Convention Against Torture, we think you're going to torture. Please assure us that you won't. So it's difficult to get the State Department to ask, difficult to credit it, because ultimately the question becomes, as per his statements, it's true. A district court in the fourth case has said that it's unconstitutional to do the assurance process, so it's extremely rare, four cases in 12 years for assurances. And ultimately what Mr. Chima did was he made a choice. He says, I'm giving up this CAT grant, this Convention Against Torture grant, that protects me no matter, even if they found me to have engaged in terrorist activity, even if I'm a danger to national security. He would not be sent back to India as long as that grant was in place. And he gave it up, voluntarily and knowingly. You know, you've done a very able job explaining this, and I'm not holding you responsible for all the actions of the United States government, but I'll tell you what's very puzzling to me, to say the least, is that this began in 1993 and has gone on until 2008, and I don't quite understand the delays. And I don't know whether the government would like to give us an accounting of how all the delays occurred or whether you'd like me to do it. It really is a blemish that he would rather go back and be tried by a court in India than seek justice from the Ninth Circuit. We look terrible. The board looks terrible. There must be something to say as to how this horrible delay occurred. I'm not blaming you at all personally, but I'm wondering if the government should undertake to do it or whether you'd like the court to do it. No, I think I can give an explanation on the process. I've been involved in this case probably from the get-go, along with Mr. Job, at least as a supervisor, attorney or otherwise. He entered the country without documents, was paroled in and was free, and while he was free, engaged in the activities that, of course, formed the FBI investigation and ultimately led to these charges. Then his parole was revoked and he was detained. He then went to district courts on three separate occasions to obtain rid of habeas corpus. On the first one, in front of Judge Beyer, he failed. He appealed to the Ninth Circuit. Ninth Circuit refused to reverse but affirmed the denial of his petition, so he stayed in detention. He appealed. He filed a second petition for rid of habeas corpus in front of Judge Beyer again, who denied he did not appeal that one. On his third one, ultimately toward the end of his detention, he filed another petition for rid of habeas corpus. Judge Elston granted that, as Mr. Job said. Indeed, then she, however, stayed her order pending for a temporary period of time in which then all of the things that occurred here then, in fact, occurred. He went to the immigration court. The board then sent back its, excuse me, issued its decision. He sought and obtained his deferral grant termination. He did not seek, he filed a petition for review but did not seek to obtain a stay and then was removed. Now, that's a long time indeed for eight years, but indeed, Your Honor, there were 26 separate hearings in this case. This was not our standard immigration case. I mean, the immigration judges adjudicate 250,000 of these a year. This was an extraordinary case, 26 separate hearings. Mr. Job called 11 witnesses. A huge record was involved. Because of the allegations and charges, Mr. Job ultimately, I think, one of the questions became whether or not he had due process. He did, in fact, have notice in the sense that he called 11 witnesses and was so successful in countering the charges made against him that it convinced an immigration judge at least that the impact of the evidence was sufficient ultimately to get him withholding. So it's a long case, Your Honor, and he was detained pending that. And then there was an appeal, went to the board, came to this court, went back to the board, came back again. It's a long time, and I can't imagine personally what it's like to be in detention for eight years. I can't imagine that, but ultimately, you know, the courts have had scrutiny over this case for a long time, and we've tried to follow the law. I don't think we took more than a few months, and then I went back to the board, and it's been several years since we've seen it. I'm just saying that this is indeed an extraordinary case, and I think that ultimately Article III judges scrutinized it and found that we were following the law and that he had no constitutional rights to ultimately be free. I don't want to give short shrift to his wife's claim. Yes. And the specific question there is why it's not like the Kalabi case, which was reversed because there was no adverse finding of credibility in that case, but then they invoked credibility issues with respect to the discretionary denial of asylum. We're kind of like that. I apologize for not addressing that case in the brief. Ultimately, the candor problem has to be set aside by that Ninth Circuit case. But what remains then is the allegations of conspiring to commit immigration fraud. But how do we know if the candor problem is sliced off, how do we know that in the balancing and weighing that you'd get the same decision? Well, I think that's an excellent question, if in fact they erred with regard to the candor that should be remanded for. And I want to ask you about that. It's kind of incredible to me that if you're being charged with some kind of alien smuggling or some violation, that you don't know precisely what it is. Well, I'm trying to remember what's on this particular issue, what is classified and what is not. And to be frank, I don't want to speak out of school on that one. But it seemed that there were allegations made. Mr. Job talks about a daughter. There is, in fact, a statutory waiver for trying to smuggle in a minor child or spouse. There were allegations of a nephew. And that's the one that ultimately is not excusable under the Act. And therefore, because that's the – it was an open – Is that the one, though, where the money went and then it was returned, so nothing really happened? Nothing really happened, but she conspired to do so. And ultimately, if in fact there was enough evidence, clear and convincing evidence of that fact, that would be a deportable offense in and of itself. But if in fact there is not sufficient evidence to charge and fine, that that evidence nonetheless may be considered in the exercise of discretion. But if it's something more – so if we take out the daughter and if it's something more than the nephew, then that would be a classified reason. Is that your position? I believe there's information sufficient for the nephew to go without the classified information. I understand. But if there's something more – If there's something more and the board looked at that, then, indeed, that would be classified. Then that would be classified. And that refers me back to INA Section 240B4B, which expressly grants authority to use confidential information. Right. In terms of her defenses. Yeah. I mean, they say, guess what? We've got you for some kind of offense related to immigration fraud, but we can't tell you what it is. I mean, that's the position she would be in going back, right? If, in fact, the board then relied on the classified evidence again, that's probably, in any case, the right. But, again, Congress has said that with regard to its own balancing, it's appropriate to do so if they decide to do so. Thank you. Thank you, Your Honor. Before you go, I'd just like to review where we stand on secret information. As I understand it, you're going to provide us with the classified board decision. We are going to check our records to see whether we still have the classified data you originally submitted. We may not have it. Well, we don't have it because we can't have it. Would you like me to resend this to make sure that you get the others? I mean, resend the whole package then. Then I would, at least, and I think my colleagues would appreciate Homeland Security's position, do our hard parts then need security clearance to handle it? Yeah. Without being picky on that, Your Honor, it's the FBI that does that, and we'll make a request through the Department of Justice that that be expedited. Okay. Thank you. All right? Thank you. Thank you, Your Honor. I did supply a Rule 28J letter. Yes, we received that. Okay. Thank you very much. Mr. Joe, I've got to tell you, just as you start, I don't have your reply brief. Oh, you're kidding. I don't either. Oh, Superintendent. Huh. No, we did a very extensive reply brief dealing with the issue of mootness. I said to my law clerk, where's the reply brief? She checked. The clerk didn't have it. Well, I'm shocked. Were you late? No, it was received and it was filed properly. When was it filed? It looks like it was filed on March 6th. March 6th? When you referred to the decision of the Supreme Court of India. That was news. Oh, no. No, we filed a 20-page reply brief dealing with the... We have some of the Google information from the record, but... I didn't get a reply brief. I think that might be an internal court error. We have to go back to our clerk and see what happened. Yeah. Would you undertake to follow up with the clerk just to see if it was improper? Of course. Improperly not filed or whatever the case may be? Yes. You know, one danger in our clerk's office, anybody named Singh. That's true. That's true. Right. But in any event, the court, if for some reason, because you've represented that it was, you know, timely sent, et cetera, if for some reason they don't have it, then by way of the court, we authorize you to file it now. Okay. And we never received any notice of deficiency or anything. Right. Yeah. It's there, and I'll make sure you... Well, it's not unusual for people to neglect to file a reply brief, so that wouldn't raise any red flags. Right. Right. Okay. You have it, and I'll make sure the three of you get it. We'll get it again. Yeah. All right. Thank you. In Castillo-Perez, this court held that where there's a due process violation during the course of a deportation proceeding, the remedy is to restore the alien to the position he otherwise would have been in but for that due process violation. That's all we're asking for here, is that you restore Mr. Chima to the position he would have been in. Now, the government is not being honest with you when it says that to restore Mr. Chima to the position he otherwise would have been in, he would have to be admitted to the United States, and he can't. That's not true, because he never was admitted, and he never had any chance of being admitted because he's always been somebody who had proper documents, and he's always been somebody who had engaged in terrorist activity. The position that he was in previously never, ever gave him any chance of being admitted. That's no different now. To restore him to the position that he was in previously so that he can pursue this application, all that means is you restore him to the status of a parolee. As my opposing counsel just pointed out to you, he was paroled into this country. He was not admitted. And for 14 years, he lived in this country not as somebody who'd been admitted because he's never been admissible. He lived in this country as a parolee, and that's the only status he would be entitled to if he's granted withholding. That's the only status we're seeking. And what's the due process violation that would justify restoring him to that status? What is it? The reliance on the classified information, Your Honor. The board, because it couldn't come up with any unclassified evidence, all it offered you were assumptions that this court had previously rejected. It resorted to the classified evidence, Exhibit 82, and you need to look at that closely. It's an affidavit. Is that on the point of his danger to the U.S. and security, not on the point of the terrorism? Is that correct? Well, the board says it's on the issue of danger to national security, but we've never, ever been apprised of that in any sort of summary or we've never given notice that it was on that issue. But procedurally, why isn't that moved? You know, I think it's kind of we're having a special discussion here. Well, I want to go back to this. I mean, this Abdallah case, the government didn't rely on Abdallah, and we brought a thousand cases here, but we don't have Abdallah. But from what my colleagues tell me, Abdallah seems to be distinguishable for at least two reasons. I mean, one, this is a very unique situation. It's also different from Chung. In Chung, like Abdallah, as I understand it, I've got to go back and look at the case, the BIA made a specific finding that the individual did not face a probability of persecution. So the person's removal, that doesn't necessarily mean that he was continuing to be threatened with injury as a result of the order. Here, the board made the exact opposite finding. It said that he faces a probability of persecution. That's different. The other big difference is that, you know, if Mr. Chima is unable to resuscitate this application because you declare it moot and he's forced to come back, there's a massive collateral consequence. It's not like a case where there aren't terrorism issues, because if he comes back and he applies for withholding again, he's permanently ineligible to refile. The only way he can qualify is if this case is not moot, and he can resume his litigation of this case, because for purposes of this application under AEDPA, there's that exception for people who are not a danger to national security. The procedure is just very difficult to see how this can be resurrected. Well, I don't agree. I know I'm out of time, but I think if you go back and you just apply the basic test, is it moot? There's no way it is. He was denied withholding of removal. He's continuing to suffer harm or threatened injury of the most despicable sort, persecution. And there's something this court can do about it. You don't have to order that he be admitted. All we're asking is that he be restored to the status of a parolee, brought back here, paroled and just as he was. The grounds of inadmissibility, none of them apply to parole. None of them. So parolees, that's how they come in. They come in because they don't have proper documents or they're inadmissible as terrorists, whatever the ground may be. That's why parole is there. Thank you. Thank you, Your Honor. We appreciate your arguments. The case of Cower and Sinchima v. Mukasey is submitted. I also want to say that we appreciate, Mr. Job, that you took this pro bono, because these are complicated cases. They're important cases. And, of course, individuals like these deserve representation. I think it's helpful not only to the court but also to Department of Homeland Security to have represented petitioners in these cases. So thank you. And the case is submitted and the court is adjourned for this morning. I'd like to take the opportunity that some of us heard immigration cases in 21 years to say this is one of the best arguments I have heard, both on the part of Mr. Job and the part of Mr. Farr. And I want to express my real admiration for the way both of them handled it. Thank you. I think we all agree. And with that, maybe we'll open it to questions. You all, of course, the counsel, are welcome to stay as well. We won't answer any specific questions regarding this case, as you might imagine.
judges: Noonan, McKeown, Rawlinson